# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

LAKIESHA ELLISON,          )
                                          )
        Plaintiff,          )
                                          )
        v.                     )      Case No. 4:12-CV-71-AGF-NAB
                                          )
MICHAEL J. ASTRUE,       )
                                          )
        Defendant.      )
                                          )

## REPORT AND RECOMMENDATION

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Lakiesha Ellison's ("Ellison") application for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. § 1381 *et seq.* Ellison alleges disability due to diabetes and pancreatitis. Ellison filed a Brief in Support of Plaintiff's Complaint. [Doc. 15]. The Commissioner filed a Brief in Support of the Answer. [Doc. 20]. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) for a report and recommendation. [Doc. 4].

## I.      Background

On October 9, 2009, Ellison filed an application for SSI. (Tr. 123-127.) The Social Security Administration ("SSA") denied Ellison's claim and she filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 60-61, 67-70.) The SSA granted Ellison's request and the hearing took place on December 20, 2010. (Tr. 30-57, 71-83). The ALJ issued a written decision on January 28, 2011, upholding the denial of benefits. (Tr. 17-29.) Ellison requested review of the ALJ's decision by the Appeals Council. (Tr. 10.) On November

8, 2011, the Appeals Council denied Ellison's request for review. (Tr. 4-8.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Ellison filed this appeal on January 12, 2012. [Doc. 1]. The Commissioner filed an Answer. [Doc. 9] Ellison filed a Brief in Support of her Complaint. [Doc. 15]. The Commissioner filed a Brief in Support of the Answer. [Doc. 20].

## II.    Decision of the ALJ

The ALJ found that Ellison has not engaged in substantial gainful activity since September 28, 2009. (Tr. 19.) He determined that she had the following severe impairments: diabetes mellitus, pancreatitis, obstructive sleep apnea, and obesity. *Id.* The ALJ also found, however, that Ellison did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d)), 416.925, and 416.926). *Id.* Next, the ALJ determined that Ellison had the residual functional capacity ("RFC") to perform the full range of medium work as defined in 20 C.F.R. § 416.967(c). *Id.* Because Ellison has no past relevant work, is a younger individual under the regulations, with a limited education and the ability to communicate in English, the ALJ found that jobs exist in significant numbers in the national economy that Ellison can perform. *Id.* Therefore, the ALJ concluded that Ellison has not been under a disability as defined in the SSA since September 28, 2009.

Ellison contends that the ALJ's RFC determination did not properly account for her obesity, sleep apnea, and nonexertional limitations; the ALJ's did not conduct a credibility assessment consistent with Eighth Circuit law, and that the Appeals Council failed to consider new and material evidence as required by the SSA regulations. The Commissioner contends that the decision is supported by substantial evidence on the record as a whole.

### III.    Administrative Record

The following is a summary of the relevant evidence before the ALJ.

### A.    Hearing Testimony

The ALJ held a hearing on this matter on December 20, 2010.  (Tr. 30-57.)  The ALJ heard testimony from Ellison.  She was represented by counsel.

Ellison provided the following testimony.  Ellison was twenty-eight years old at the time of the hearing and tenth grade was the highest level of school that she completed.  (Tr. 34.)  She left school in the tenth grade, because she got sick and never went back.  (Tr. 44.)  She could not walk, because she had pain in her body.  *Id.*  Ellison was not working and has never worked. (Tr. 34, 44.).  She has diabetes, pancreatitis, sleep apnea, and glaucoma.  (Tr. 35.)

Ellison was diagnosed with diabetes in 1998.  (Tr. 35.)  Ellison takes insulin to control her blood sugar, which she checks daily.  (Tr. 35-36.)  Ellison's blood sugar is between 200-300 most of the time and has gotten as high as 400.  (Tr. 36.)  She takes a set amount of insulin.  *Id.* She was hospitalized for problems with her diabetes when she was younger.  (Tr. 37.)  She has a lot of pain in her feet and numbness in her fingertips and hands daily.  (Tr. 46.)  Ellison can sit for an hour and stand for thirty or forty minutes before she starts feeling pain, tingling, and numbness.  (Tr. 47.)  She cannot walk too far without her feet hurting and getting back pain.  *Id.* Ellison tries to exercise by walking or riding her exercise bike at the most four times per week for no more than fifteen minutes.  (Tr. 48.)

Ellison has always had problems with her vision.  (Tr. 37.)  She takes eye drops for the glaucoma two to three times per day.  (Tr. 37, 49-50).  The eye drops help with her daily throbbing eye pain.  (Tr. 50.)  She does not know what her visual acuity is, but she was prescribed glasses for seeing at a distance.  (Tr. 38.)  She does not wear glasses now, because she

cannot afford to get them right now.  *Id.*  Her vision is blurry sometimes every day, but it does not stay blurry a long time.  (Tr. 49.)  The blurry vision causes problems with reading, people, and looking at the computer.  *Id.*

Ellison lost most of her pancreas and it is the reason why she is diabetic.  (Tr. 39.)  She also has problems with her stomach, digesting food, and pain.  *Id.*  She is on a special diet, but it does not completely stop her stomach from hurting.  (Tr. 46.)  She takes Pepcid, Mylanta and similar medication for the pain, but it does not help.  *Id.*  She also gets nauseous sometimes.  (Tr. 50.)  Her gallbladder was taken out in 1999, because she had gallstones.  (Tr. 39.)  She believes that her pancreas was taken out at the same time her gallbladder was taken out, but she doesn't know what happened or really know about that.  *Id.*  She has been hospitalized regarding her pancreas since then, but she does not remember when.  (Tr. 40.)  She has sharp, aching, burning pains in her pancreas every day.  (Tr. 45.)  Ellison guessed that she has been hospitalized three times and she was probably last hospitalized more than three years ago.  *Id.*

Ellison recently had a sleep study done at the recommendation of her "diabetic doctor," because she had a lot of bad migraine headaches and was tired all of the time.  (Tr. 40.)  She remembers them saying that she had sleep apnea, but that is all she can remember.  (Tr. 40-41.)  She uses a CPAP machine at home.  (Tr. 41.)  The CPAP machine stops her migraine headaches, but she is still tired.  *Id.*  She gets migraine headaches once a week.  (Tr. 51.)  She has not had any problems using the CPAP machine.  (Tr. 41.)  She sleeps most of the day and has problems going to sleep at night.  (Tr. 48.)

Ellison also states that she is unable to raise her right arm over her head.  (Tr. 51.)  She has pain in her knee and she has lower back pain a lot.  *Id.*  She is not capable of lifting anything over five pounds.  *Id.*

Ellison lives with her mom and dad and she stays in the house most of the time. (Tr. 41.) Ellison cooks sometimes, cleans her room, and does her own laundry. (Tr. 42.) She does not vacuum or sweep. *Id.* During the day, Ellison watches TV, listens to the radio sometimes, and sleeps a lot. *Id.* She does not have any friends. (Tr. 43.) She has one sister that she does things with, but not that often because she is tired or not feeling good most of the time. *Id.* When she does leave home, she goes to the grocery store or clothing store. *Id.* She goes grocery shopping once every two weeks. (Tr. 49.) She does not have a driver's license, but she has also never used public transportation. (Tr. 44.)

### B.    Medical Evidence

Between March 6, 1998 and May 20, 1998, Ellison was hospitalized at St. Louis University ("SLU") Hospital. (Tr. 305-347.) Ellison was fifteen years old at the time. A few days prior to her admission at SLU, Ellison was admitted to another hospital for pancreatitis due to multiple gallstones. (Tr. 337.) On March 4, 1998 Ellison went into cardiac arrest, coded, and was successfully resuscitated. *Id.* She was then transferred to Cardinal Glennon Children's Hospital where she was diagnosed with necrotizing pancreatitis and then transferred to SLU's intensive care unit for transplant evaluation. *Id.* During her hospitalization, Ellison developed acute respiratory distress syndrome, acute renal failure, pneumonia, and insulin dependent diabetes among other issues. (Tr. 306-07, 337). The doctor noted that she would need aggressive physical and occupational therapy. (Tr. 307.).

On November 11, 1998, Ellison underwent an endoscopic retrograde cholangio pancreatography[1] ("ERCP"). (Tr. 348-349.) Biliary stones were removed by sphincterotomy[2]

---

[1] ERCP is a "method of using an endoscope to inspect and cannulate the ampulla of Vater, with injection of contrast medium for radiographic examination of the pancreatic, hepatic and common bile ducts." Stedman's Medical Dictionary 337 (27th ed. 2000).

during the ERCP. (Tr. 349.) On March 15, 1999, Ellison underwent a Roux-en-Y pancreatojejunostomy[3] as well as a cholecystectomy[4]. (Tr. 350-359.)

Ellison visited Comprehensive Health Centers for treatment between October 13, 2008 and December 30, 2009. (Tr. 181-235). Dr. Laila Hanna treated Ellison twice in October 2008. Ellison reported to Dr. Hanna that she had stomach pain, lower back pain, which had been ongoing for months, and that she needed to check her diabetes. (Tr. 184.) Dr. Hanna noted that Ellison was obese and had Type II diabetes mellitus, uncomplicated and uncontrolled. (Tr. 181,185.) Ellison reported that she did not have a headache, vision problems, chest pain, dizziness, sleep disturbances, or abdominal pain. (Tr. 182-83.) Ellison's home blood sugar test showed her blood sugar at 399. (Tr. 181.) Ellison reported that she was now following a diet and taking medication. (Tr. 181.)

On January 14, 2009, Ellison visited St. Louis Connect Care via a referral from Dr. Hanna for persistent elevated blood sugar. (Tr. 233.) Ellison reported that she had multiple episodes of nausea, vomiting, and abdominal pain for the last few months and it had become more frequent. Ellison also reported numbness and tingling of her extremities and headaches off and on. *Id.* Ellison denied blurring of vision and admitted that she had not followed up regularly with an eye doctor. *Id.* Ellison received medication and referrals to ophthalmology and a dietician. (Tr. 235.)

On January 28, 2009, Ellison had a follow-up visit for diabetes. (Tr. 228-231.) Ellison reported that her headaches were better, she had lost one pound, but her blood sugar was still elevated. (Tr. 228.) On February 9, 2009, Ellison visited Henry Bradford, D.P.M. for diabetes

---

[2] Sphincterotomy is an "incision or division of a sphincter muscle." Stedman's Medical Dictionary 1669 (27th ed. 2000).

[3] Roux-en-Y pancreatojejunostomy is the "surgical anastomosis ("opening created by surgery between two or more normally separate spaces or organs") of a pancreatic duct, cyst, or fistula to the jejunum (a "portion of small intestine")." Stedman's Medical Dictionary 70, 933, 1303 (27th ed. 2000).

[4] A cholecystectomy is the surgical removal of the gall bladder. Stedman's Medical Dictionary 337 (27th ed. 2000).

follow-up and a LEAP[5] exam. (Tr. 225.) Ellison reported that she did not have any leg pain, tingling or numbness of the limbs, and no fissures. (Tr. 225.) Dr. Bradford noted that her toes and feet showed a normal appearance and there was not loss of protective sensation demonstrated in the feet. (Tr. 226.) It was recommended that she wear appropriate shoes. (Tr. 226.)

On February 25, 2009, Ellison visited Connect Care for a follow-up regarding her diabetes. (Tr. 222-224.) She reported that her blood sugar was 305 before she ate breakfast. (Tr. 222.) Ellison also complained of headaches lasting all day off and on for two weeks and dizziness. *Id.* Ellison reported that Aleve did not help. *Id.* On March 5, 2009, Ellison had a follow-up visit with Dr. Hanna. (Tr. 219-221.) Ellison denied having worsening vision, chest pain or discomfort, dyspnea, changes in urinary habits, tingling or numbness of the limbs, lesions on her feet, dizziness, nausea, vomiting, or sleep disturbances. (Tr. 219-220.) Ellison did report having a headache and her skin breaks out when her blood sugar is high. (Tr. 220.) Dr. Hanna observed that Ellison's feet appearance, balance, and gait were normal.

Ellison visited St. Louis Connect Care's Endocrinology Department on April 1, 2009. (Tr. 217-218.) It was noted that she had gained 6 pounds and that her blood sugar was 150. *Id.* On June 15, 2009, Ellison had a routine ophthalmology visit with complaints of blurry vision. (Tr. 213-216, 274-277.) Laila Gabrawy, M.D. prescribed eyeglasses for Ellison. (Tr. 214, 275.) On August 11, 2009, Ellison met with Dr. Hanna for a follow-up visit. (Tr. 200-202.) Ellison denied having a headache, worsening vision, dyspnea, chest pain or discomfort, dizziness, tingling or numbness in the limbs, sleep disturbance, lesions on her feet, vision problems, or

---

[5] LEAP is the acronym for Lower Extremity Amputation Prevention, which is a comprehensive program that can dramatically reduce lower extremity amputations in individuals with diabetes mellitus and involves an annual foot screening. www.hrsa.gov/hansendisease/leap/. Accessed February 28, 2013.

recent weight change. (Tr. 200-01.) Ellison reported that she was feeling poorly. (Tr. 201.) Dr. Hanna observed that Ellison's feet appearance, balance, gait, and stance were normal. (Tr. 202.)

Ellison visited Myrtle Hilliard Comprehensive Health Care Center on September 10, 2009 in response to a recall letter. (Tr. 199.) It was noted that Ellison's diabetes was poorly controlled. Ellison was advised regarding her diet, exercise, and weight reduction. (Tr. 199.) Ellison did not voice any complaints. (Tr. 199.) On September 23, 2009, Ellison visited St. Louis Connect Care. Ellison did not have any complaints of pain. *Id.* She had gained seven pounds. *Id.* It was noted that she had a history of sleep apnea and her blood sugar at home was between 200 and 300 in the morning. *Id.* Ellison was advised to follow her diet better, see Dr. Hanna regarding sleep apnea, and received refills for her prescription medication. *Id.*

On November 18, 2009, Ellison visited Dr. Hanna. (Tr. 193-195.) Ellison reported that she was watching her diet and not really exercising. (Tr. 193.) She complained of difficulty going to sleep and staying asleep. *Id.* Ellison denied any change in appetite, abdominal pain, urinary changes, and skin rashes. (Tr. 193.) Dr. Hanna noted that Ellison's diabetes mellitus was poorly controlled and that Ellison needed to follow a diet and see a dietician. (Tr. 194.) Dr. Hanna also noted that Ellison needed to see an eye doctor, foot doctor, and maybe obtain a CPAP. (Tr. 194.) On December 7, 2009, Ellison had a follow-up visit. (Tr. 190-191.) Ellison complained of abdominal pain, and dull aching lower back pain, for three months. (Tr. 190.) Ellison reported that the pain is worse after eating food and that she experienced nausea, vomiting, slight heart burn, bloating, and slight blurred vision. (Tr. 190.) Ellison denied dizziness, numbness, urinary symptoms, or recent trauma. (Tr. 190.)

On December 16, 2009, and December 30, 2009, Ellison visited St. Louis Connect Care. The December 30, 2009 visit was on a referral from her primary care physician for abdominal

pain, however, Ellison reported no pain on that date. (Tr. 236-238.) Ellison reported that the abdominal pain was long standing and non-descript, but worsened when eating. (Tr. 236.) She reported that the pain occurs every day and is associated with nausea. *Id.*

On January 21, 2010, Jason Lawrence, completed a Physical Residual Functional Capacity Assessment for Ellison. (Tr. 246-251.) In his assessment, Lawrence opined that Ellison did not have any postural, manipulative, visual, communicative, or environmental limitations and has unlimited ability to push and or pull. (Tr. 247-250.) He determined, however, that Ellison is limited to occasionally lifting and/or carrying 20 pounds; frequently lifting or carrying 10 pounds; and standing, walking, or sitting six hours in an eight hour work day. (Tr. 247.) Lawrence opined that Ellison's diabetes mellitus was poorly controlled. *Id.* He noted that the assessment took Ellison's pain into consideration and that Ellison was physically limited due to obesity. *Id.* He also noted that Ellison's hypertension was controlled when she was compliant with her treatment plan. *Id.*

On January 25, 2010, a CT scan was performed on Ellison's abdomen and pelvis. (Tr. 256-57.) The CT scan showed that her liver, spleen, pancreas, adrenal glands, kidneys, bowel loops, stomach, and retroperitoneal great vessels were unremarkable. (Tr. 256.) Surgical clips from previous surgeries were observed. *Id.* There was no mass, lymphadenopathy[6] or fluid collection. *Id.*

Ellison visited Dr. Gabrawy for blurry vision and eye pain in March, April, and August 2010. (Tr. 263-271, 286-87.) Ellison was prescribed the medication Travatan and eyeglasses for her vision problems and eye pain. (Tr. 266-67, 270, 287.)

---

[6] Lymphadenopathy is any disease process affecting a lymph node or lymph nodes. Stedman's Medical Dictionary 1038-39. (27th ed. 2000).

On March 10, 2010, Ellison visited St. Louis Connect Care for abdominal pain and to review lab results. (Tr. 303.) Ellison reported that her abdominal pain continues when she eats. *Id.* On March 15, 2010, Ellison visited Dr. Barbara Lutey. (Tr. 301-03). Ellison was referred to Dr. Lutey for evaluation of possible obstructive sleep apnea. (Tr. 301.) Ellison reported that she had gained 15 pounds during the past few months and that she had dizziness sometimes. *Id.* Ellison denied having chest pain or discomfort, dyspnea, heartburn, or localized joint pain. *Id.* Dr. Lutey recommended a chest x-ray, weight control, and daily exercise. (Tr. 302.) She also stated that Ellison needed an evaluation at a sleep center. (Tr. 302.)

On May 10, 2010, Dr. Jay Piccirillo examined Ellison after a referral from Dr. Lutey. (Tr. 258.) Dr. Piccirillo opined that Ellison likely had obstructive sleep apnea and recommended a diagnostic sleep study. *Id.* On May 19, 2010, Ellison visited Dr. Gonuguntla to follow-up on abdominal pain, which Ellison indicated she was not currently experiencing. (Tr. 299.) On August 8, 2010, Ellison visited Dr. Arnold Brody. (Tr. 298.) Ellison complained of upper abdominal pain with a pain level of 5 out of 10 and nausea. *Id.* Dr. Brody recommended that Ellison keep blood sugar records and bring in diet drinks. *Id.* On June 2, 2010, Ellison completed an all-night polysomnogram[7]. (Tr. 259-260.) Dr. Piccirillo determined that the polysomnogram was abnormal, because it provided evidence of mild obstructive sleep apnea syndrome. (Tr. 259.) Dr. Piccirillo opined that Ellison would benefit from treatment with positive airway pressure ("CPAP"). *Id.* On July 12, 2010, Ellison had another polysomnogram with CPAP titration. (Tr. 261-262.) Dr. Piccirrillo determined that the CPAP titration was an effective treatment for Ellison's obstructive sleep apnea. (Tr. 261.)

---

[7] A polysomnogram is the recorded physiologic functions obtained in polysomnography, which is the simultaneous and continuous monitoring of relevant normal and abnormal physiologic activity during sleep. Stedman's Medical Dictionary 1425 (27th ed. 2000).

On July 28, 2010, Ellison visited Dr. Hanna for a diabetes follow up and a re-fill on her insulin.  (Tr. 288-290.)   Ellison reported that she had no worsening vision, chest pain or discomfort, dyspnea, polyphagia, no changes in urinary habits, tingling or numbness of the limbs, or lesions on her feet.  (Tr. 288.)  Ellison did report that she had insomnia.  (Tr. 289.)  It was noted that Ellison had poor exercise habits, no physical disability, and her activities of daily living were normal.  *Id.*  It was also noted that Ellison had a normal balance, gait, and stance.  *Id.* Dr. Hanna recommended that she consult with an endocrinologist.  (Tr. 290.)

In August and October 2010, Ellison visited Dr. Veronica Cross with complaints of bleeding between her periods.  (Tr. 280-285.)  Upon physical examination on those dates, it was noted that Ellison had poor exercise habits, but had no physical disability and that her activities of daily living were normal.  (Tr. 281.)  Dr. Cross ordered laboratory tests and an ultrasound. (Tr. 284-85.)  The laboratory tests were unremarkable and normal.  (Tr. 281.)  Dr. Cross then changed Ellison's birth control from Provera to Loestrin.  (Tr. 282.)

On October 20, 2010, Ellison visited Dr. George Pelican.  (Tr. 294-296.)  Ellison came for a follow-up visit and complained of not feeling well, infrequent heartburn, and daily nausea. (Tr. 294-95.)   Dr. Pelican noted that a CT of the pancreas was negative and an esophagogastroduodenoscopy[8] ("EGD") was normal.  (Tr. 294.)  Dr. Pelican also noted that Ellison's abdomen was normal and there was no abdominal tenderness.  (Tr. 295.)  Dr. Pelican concluded that because Ellison had a normal CT, no response to pancreatic enzymes, a normal

---

[8] Esophagogastroduodenoscopy is an "endoscopic examination of the esophagus, stomach, and duodenum usually performed using a fiberoptic instrument."  Stedman's Medical Dictionary 619 (27th ed. 2000).

EGD, there was no evidence for recurrent pancreatitis and her dyspepsia[9] could be functional. *Id.* He recommended that she avoid certain foods and avoid exposure to triggers. *Id.*

On January 26, 2011, Ellison was taken by ambulance to Barnes Jewish West County Hospital for lower back pain radiating down her left leg. (Tr. 360-377.) Ellison reported that she has had the pain for a week and rated the pain 10 out of 10, noting that the pain worsened with movement. (Tr. 360, 362.) Ellison denied any leg weakness, numbness, or tingling. (Tr. 362.) An X-ray of her lumbar spine showed mild degenerative disc disease at L4-L5. (Tr. 365.)

Ellison visited Dr. Hanna twice in February 2011, as a follow-up to her emergency room visit in January. (Tr. 378-384.) Ellison reported that she was still having pain radiating down her left leg (Tr. 381.) Dr. Hanna ordered laboratory tests at the first visit. (Tr. 382-83.) At her second visit, Ellison reported that she did not have any symptoms since her last visit. (Tr. 378.) Ellison did state that the pain level in her left leg was at a 7. (Tr. 379.) Ellison's medications were adjusted. Dr. Hanna recommended that Ellison consult with an endocrinologist and gynecologist. (Tr. 380.) Dr. Hanna emphasized Ellison's diet, exercise and weight reduction. *Id.* Ellison accepted a dental referral, but declined a referral to a dietician. *Id.* At both visits, Dr. Hanna noted that Ellison had no physical disability and her activities of daily living were normal. (Tr. 378, 381.)

On February 9, 2011, Ellison visited Dr. Bradford for a LEAP examination. (Tr. 385-86.) Ellison denied leg pain or tingling and numbness of her limbs. (Tr. 385.) Ellison reported a burning sensation at the top of her left foot. *Id.* Dr. Bradford found there was loss of protective sensation in both feet. *Id.* He determined that Ellison developed diabetic peripheral neuropathy. (Tr. 386.) Dr. Bradford noted that Ellison had no physical disability and that her activities of

---

[9] Dyspepsia is "impaired gastric function or 'upset stomach' due to some disorder of the stomach; characterized by epigastric pain, sometimes burning, nausea, and gaseous eructation." Stedman's Medical Dictionary 554 (27th ed. 2000).

daily living were normal. (Tr. 385.). He recommended that she wear appropriate shoes. (Tr. 386.)

## IV.    Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § 416.920. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § 416.920(a)(4)(i),(b). Second, the claimant must have a severe impairment. 20 C.F.R. § 416.920(a)(4)(ii),(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." *Id.* The impairment must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 416.909. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. § 416.920(a)(4)(iii),(d), Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. 20 C.F.R. § 426.920(d).

Fourth, the impairment must prevent claimant from doing past relevant work.[10]  20 C.F.R. § 416.920(e).  At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC").  *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 416.945(a) and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 416.945(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past.  20 C.F.R. § 416.920(e).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  20 C.F.R. § 416.920(a)(4)(iv),(f).  If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled.  20 C.F.R. § 416.920(a)(4)(v).  At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform."  *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  The Commissioner must prove this by substantial evidence.  *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).  If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled.  "The ultimate burden of persuasion to prove disability, however, remains with the claimant."  *Id.  See also*

---

[10]  Past relevant work is work that you have done within the last 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.  20 C.F.R. § 416.960(b)(1).

*Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V.    Discussion

Ellison asserts that the ALJ erred by (1) failing to consider the nonexertional limitations caused by her obesity and sleep apnea and (2) failing to address the credibility factors in

discrediting Ellison's testimony. Ellison also contends that the Appeals Council failed to sufficiently consider new and material evidence pursuant to the regulations.

### A.     New Evidence Submitted on Appeal

Ellison submitted additional evidence to the Appeals Council after the ALJ's decision was issued on January 28, 2011. (Tr. 360-377, 378-384, and 385-86.) This evidence consisted of an emergency room visit and visits with Dr. Hanna and Dr. Bradford. The Appeals Council stated in its decision that it considered the additional evidence and found that it did not provide a basis for changing the ALJ's decision. (Tr. 5.) Ellison contends that the additional evidence directly contradicts the findings of the ALJ.

In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the Appeals Council." *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000) (citing *Jenkins v. Apfel*, 196 F.3d 922, 924 (8th Cir. 1999)). In cases seeking SSI benefits, the claimant must prove that she was disabled while her application was pending, which is the time period from the date her application is filed to the date of the ALJ's decision. 20 C.F.R. §§ 416.330, 416.335. "In reviewing decisions based on an application for benefits, if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.1470(b). "To be new, evidence must be more than merely cumulative of other evidence in the record." *Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012). "[Evidence] is material if it is relevant to claimant's condition for the time period for which benefits were denied." *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008). "[The] additional evidence must not merely detail after acquired conditions or post-decision deterioration of a pre-existing condition." *Bergmann*,

207 F.3d at 1069-1070. "Additional evidence showing a deterioration in a claimant's condition significantly after the date of the Commissioner's final decision is not a material basis for remand, although it may be grounds for a new application for benefits." *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997).

"In such a situation, "[a] court's role is to determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" *Bergmann*, 207 F.3d at 1068 (citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)). "In practice, this requires [a] court to decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." *Bergmann*, 207 F.3d at 1068 (citing *Riley*, 18 F.3d at 622). Thus, the appropriate inquiry is not whether the Appeals Council erred, but whether the record as a whole supports the decision made by the ALJ. *Perks*, 687 F.3d at 1093 (citing *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)).

In this case, the undersigned finds that the Appeals Council considered the new evidence submitted by Ellison. Further, the undersigned finds that the ALJ's decision is supported by substantial evidence on the record as a whole, including the new evidence submitted by Ellison. First, the only additional evidence relevant to the time period at issue was Ellison's emergency room visit where she complained of experiencing lower back pain for a week. (Tr. 360-377.) This evidence alone clearly does not outweigh the other evidence in the record that supports the ALJ's findings. Second, even if the additional evidence from Dr. Hanna and Dr. Bradford were considered, there is no evidence that the back and leg pain and the loss of sensation in her foot were so significant that Ellison suddenly became disabled under social security law. It should be noted that none of the additional evidence contains restrictions from any doctor directing Ellison to avoid working or any other activities.

Ellison emphasizes that Dr. Bradford diagnosed Ellison with diabetic peripheral neuropathy, therefore contradicting the ALJ's reasoning. At the time of the ALJ's decision, the listings of impairments included diabetes mellitus with "neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Part 404, Subpt. P., Appx. 1, 9.08(A) (2011)[11]. As indicated by the ALJ, at the time of his decision, there was no indication of diabetic neuropathy in the administrative record. (Tr. 19.) Despite Dr. Bradford's diagnosis soon after the ALJ's decision, he did not note any problems with Ellison's gross and dexterous movements, gait, or station. (Tr. 385-86.) "The claimant has the burden of proving that his impairment meets or equals a listing." *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010). "To meet a listing, an impairment must meet all of the listings specified criteria." *Id.* (citing *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004)). Dr. Ellison noted that in examining Ellison's gait and stance in the swing phase[12], her gait did not demonstrate a foot drop.[13] (Tr. 386.) Further, Dr. Ellison's notes indicate there was no hallux valgus,[14] plantar callus,[15] maceration,[16] ulcers, or deformities on her feet. *Id.* Dr. Bradford determined that Ellison should wear appropriate shoes, maintain low blood sugar, and he provided information on how to provide care for her foot. Based on the evidence in record, Ellison's diabetes neuropathy did not meet the listings requirements. Therefore, the undersigned finds that even

---

[11] This regulation was effective from August 2, 2010 to March 23, 2011.

[12] Swing phase is the "phase in which the foot is in the air for limb advancement." Uustal H, Baerga E. Gait Analysis. In: Cuccurullo S, editor. Physical Medicine and Rehabilitation Board Review. New York: Demos Medical Publishing; 2004. http://www.ncbi.nlm.nih.gov/books/NBK27235/#A8415 (accessed March 6, 2013).

[13] A foot drop is a "partial or total inability to dorsiflex (extend upward) the foot, as a consequence of which the toes drag on the ground during walking." Stedman's Medical Dictionary 537, 698 (27th ed. 2000).

[14] Hallux valgus is a "deviation of the tip of the great toe, or main axis of the toe, toward the outer or lateral side of the foot." Stedman's Medical Dictionary 537, 698 (27th ed. 2000).

[15] Plantar callus is a "composite mass of tissues formed at a fracture site to establish continuity between bone ends" on the sole of the foot. Stedman's Medical Dictionary 270, 1392 (27th ed. 2000).

[16] Maceration is a "softening by the action of a liquid." Stedman's Medical Dictionary 1050 (27th ed. 2000).

considering Ellison's additional evidence from Dr. Bradford, substantial evidence on the record as a whole supports the ALJ's decision.

### B. Non-Exertional Limitations caused by Obesity and Sleep Apnea

Ellison contends that the ALJ failed to consider the non-exertional limitations arising from Ellison's obesity and sleep apnea, and failed to sufficiently analyze those conditions. According to Social Security Ruling ("SSR") 02-1p, "[o]besity can cause limitation of function. 2002 WL 34686281 at *5. "Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. . . . [Each case is evaluated] based on the information in the case record." *Id.* at *6. "[The combination of sleep apnea and obesity] "can lead to drowsiness and lack of mental clarity during the day." *Id.* "In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea." *Id.* "An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time." *Id.*

In this case, the undersigned finds that the ALJ properly determined the non-exertional limitations caused by Ellison's obesity and sleep apnea. The ALJ's opinion takes into consideration the functional limitations Ellison described in her testimony (Tr. 20.) and to her doctors (Tr. 20-25) and Ellison's medical records, which noted numerous times that she had no physical disability and had normal activities of daily living (Tr. 20-25, 181, 219, 225, 281, 289, 378, 381, 385). The undersigned notes that no doctor placed any restrictions on Ellison's activities, including working. Further, her doctors advised her numerous times to exercise. (Tr. 194, 199, 302, 380). It was also noted by Ellison's doctors that her diabetes was uncomplicated,

but poorly controlled.  (Tr. 181, 185, 194, 199, 219, 225.)   Based on the foregoing, the undersigned finds that the ALJ's decision properly considered the nonexertional limitations caused by the combination of Ellison's obesity and sleep apnea.

### C.  Ellison's Credibility

Finally, Ellison contends that the ALJ erred by failing to address the credibility factors when discounting Ellison's credibility.   Specifically, Ellison asserts that the ALJ never demonstrated how not working, applying for benefits six times, and making statements inconsistent with an Individualized Education Plan ("IEP") undermined Ellison's credibility. "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them.  *Id.*  The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints.  *Id.*  The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;

> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions

*Polaski v. Heckler*, 739 F.2d at 1322.   The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints.  *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005); *Masterson*, 363 F.3d at 738.   "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence."  *Id.* (citing *Butler v. Sec'y of Health & Human Servs.*, 850 F.2d 425, 429 (8th Cir. 1988)).   The ALJ, however, "need not explicitly discuss each *Polaski* factor."  *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).  *See also Steed*, 524 F.3d at 876 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)).   The ALJ need only acknowledge and consider those factors.  *Id.*  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988); *Millbrook v. Heckler*, 780 F.2d 1371, 1374 (8th Cir. 1985).

In this case, the ALJ noted several reasons for discounting Ellison's credibility.  First, the ALJ considered that Ellison has never worked.  (Tr. 20-21.)  Ellison testified that she had not ever tried to work.  (Tr. 44.)  The ALJ noted that Ellison had applied for Social Security benefits six times.[17]  (Tr. 21, 124-125.)  The ALJ also mentions that there was a ten year gap in Ellison's

---

[17] The undersigned notes that two of the six applications were made on Ellison's behalf, because they were made when she was a child. (Tr. 125.) One of those applications was granted. *Id.* The ALJ also mentioned that Ellison dropped out of high school in the tenth grade, because she felt too weak to attend school. (Tr. 20.) The ALJ states that this is inconsistent with the resources available to students with disabilities. *Id.* The undersigned notes that the medical records demonstrate that during Ellison's tenth grade year and thereafter, she was hospitalized for several months, in addition to having at least three surgical procedures. (Tr. 305-359.) The undersigned does not believe that actions that occurred when Ellison was a child and under intensive medical treatment, should weigh against her credibility.

receiving treatment for her diabetes. (Tr. 21.) The ALJ also noted that there was "no evidence of any motivation to work or engage in gainful activity aside from a pursuit of disability payments. (Tr. 21.)

"A lack of work history may indicate a lack of motivation to work rather than a lack of ability." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2000) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993)). "[The Eighth Circuit] has recognized that an ALJ may consider a claimant's financial motivation to qualify for benefits while assessing the credibility of a claimant's subjective pain complaints." *Ramirez v. Barnhart*, 292 F.3d 576, 582 n. 4 (8th Cir. 2002). Such motivation, however, is not dispositve of a claimant's credibility, because all disability claimants are financially motivated to some extent. *Id.* "A claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility." *Id.* The undersigned finds that the ALJ could discount Ellison's testimony regarding the severity of her symptoms, because of a motivation for secondary gain. *See Eichelberger*, 390 F.3d at 590 (ALJ could use fact that claimant's incentive to work was inhibited by long-term disability check); *Gaddis v. Chater*, 76 F.3d 893 (8th Cir. 1996) (ALJ could consider claimant's poor prior work record and fact that prospective SSI payments would exceed prior income in making credibility determination). The administrative record clearly shows that Ellison has never attempted to work and that she did not seek treatment for any condition until shortly before her current application for benefits. The undersigned finds that the ALJ could consider Ellison's motivation for secondary gain along with other factors in assessing Ellison's credibility.

Second, the ALJ noted that Ellison did not comply with her doctors' prescribed course of treatment. (Tr. 21-25.) Significantly, it is noted numerous times in the record that Ellison's

doctors told her to manage her diet, exercise, and lose weight and that her doctors referred her to dieticians and other doctors. (Tr. 194, 235, 299, 302, 380.) Instead Ellison did not manage her diet well, failed to exercise, and gained rather than lost weight. (Tr. 199, 217, 227, 302.) Ellison was also prescribed eyeglasses that she never obtained. (Tr. 38.) Ellison canceled appointments with a dietician and then finally refused a referral to one. (Tr. 185, 194, 196, 199, 202, 235, 380.) The failure to seek regular medical assistance for an alleged impairment is reason to discredit a claimant's allegation of a disabling condition. *See Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th Cir. 1997). *See also Wildman v. Astrue*, 596 F.3d at 965-66 ("noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion"); *Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (ALJ may properly consider noncompliance in determining claimant's credibility); 20 C.F.R. § 416.930(b) (unjustified failure to follow prescribed treatment is grounds for denying disability).

Third, the ALJ determined that that no doctor had rendered a medical opinion that Ellison was unable to perform any type of work or imposed any restrictions on her activities. (Tr. 31.) *See Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (lack of restrictions by treating physician supports ALJ determination that plaintiff was not disabled). The record is filled with notations by Ellison's doctors that she had no physical disabilities and had normal activities of daily living. (Tr. 181, 219, 225, 281, 289, 378, 381, 385.) The record is also devoid of any restrictions on any of Ellison's activities. "A lack of functional restrictions on [Ellison's] activities is inconsistent with a disability claim where, as here, [her] treating physicians are recommending, increased physical exercise." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009).

Finally, the ALJ found that Ellison's testimony of disabling and consistent pain was inconsistent with the medical evidence. The Court agrees.[18] The medical evidence consistently showed the Ellison denied having many of the symptoms that she claimed to have during the administrative hearing.

Based on the foregoing, the undersigned finds that the ALJ's credibility determination is supported by substantial evidence in the record as a whole. The ALJ did not rely on only one factor in determining Ellison's credibility, but examined several factors in finding Ellison not fully credible. A combination of findings that Ellison was motivated by secondary gain, failed to follow prescribed treatment, and had no work related restrictions was sufficient to find that Ellison was not fully credible. *See Eichelberger*, 390 F.3d at 590 (ALJ credibility assessment affirmed where claimant was found to lack motivation to work, had daily activities inconsistent with alleged disability, cancelled physical therapy appointments, and no doctor had imposed work related restrictions); *Ramirez*, 292 F.3d at 582 (ALJ credibility assessment affirmed where claimant had poor prior work record, refused to see dietician, did not take prescribed medication, and failed to perform prescribed physical therapy exercises).

## VI. Conclusion

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Ellison is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that relief sought by Ellison in her Complaint for Judicial Review of Decision of the Commissioner of Social Security [Doc. 1] and Plaintiff's Brief [Doc. 15] be **DENIED** and that judgment be entered in favor of the Commissioner.

---

[18] The undersigned does note that the ALJ's finding that Ellison's failure to recall her weight at the administrative hearing and varying comments about how much of her pancreas was removed as being inconsistent with the medical record were not significant enough to rely upon as inconsistent testimony undermining Ellison's credibility.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Halpin v. Shalala*, 999 F.2d 342, 345 (8th Cir. 1993).

Dated this 8th day of March, 2013.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE